Hofmann v. Sender

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

_____

August Term 2012

(Argued:  April 12, 2013        Decided: May 14,2013        Errata filed: May 15, 2013)

Docket No. 13-01-cv

_____

ADAM HOFMANN,

*Petitioner-Appellee*,

-v.-

MARINA ABIGAIL SENDER,

*Respondent-Appellant*.

_____

Before:

HALL, DRONEY, *Circuit Judges,* RESTANI,[1] *Judge.*

_____

Petitioner-Appellee initiated proceedings pursuant to Article 3 of the Hague Convention

on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 679, 1343

U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10, 494 (Mar. 26, 1986), implemented by the

International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* (2000), and

has sought return of his children to Canada from New York in order to allow the Canadian courts

to determine which parent is to be awarded custody of the children.  Respondent timely appeals

the district court's determination that the children were habitually resident in Canada under the

Convention and ICARA and, therefore, were ordered returned to Canada for further legal

---

[1] Hon. Jane A. Restani, of the United States Court of International Trade, sitting by designation.

proceedings. We agree with the district court that at the time Respondent commenced processes in the New York courts to terminate her marital relationship with Petitioner, Petitioner and Respondent's intention that the children reside in the United States was, insofar as Petitioner was concerned, conditioned on their moving to New York as an intact family, and this condition was never fulfilled. For purposes of the Hague Convention, therefore, the Petitioner and Respondent's last shared intent with respect to their children's residence was that they reside in Canada. Moreover, this appeal has not been rendered moot by the fact that the children have been returned to Canada pursuant to the district court's order. The decision of the district court is hereby

AFFIRMED.

———————————————

JEREMY D. MORLEY, The Law Office of Jeremy D. Morley, New York, NY, *for Petitioner-Appellee.*

FRANKLYN H. SNITOW, Stewart J. Epstein (*on the brief*), Snitow Kanfer Holtzer & Millus, LLP, New York, NY, *for Respondent-Appellant.*

———————————————

Hall, *Circuit Judge*:

Petitioner-Appellee initiated proceedings pursuant to Article 3 of the Hague Convention on Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11, 679, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10, 494 (Mar. 26, 1986) ("Hague Convention" or "Convention"), implemented by the International Child Abduction Remedies Act (ICARA), 42 U.S.C. § 11601 *et seq.* (2000), which "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v. Abbott*, 130 S.Ct. 1983, 1989 (2010) (internal quotation marks omitted). He

2

has petitioned for return of his children to Canada from New York in order to allow the Canadian courts to determine which parent is to be awarded custody of the children. Respondent timely appeals from the judgment of the United States District Court for the Southern District of New York (Karas, *J*.) challenging that court's determination that the children were habitually resident in Canada under the terms of the Convention and ICARA and that the children must therefore be returned to Canada for further legal proceedings.

**I. Proceedings Below**

After a five day evidentiary hearing in this case, the district court made extensive findings of fact, as follows. Petitioner Adam Hofmann is a Canadian citizen. He was born, raised, educated, and continues to work in Montreal, Quebec. ROA Doc. 28 at 4.[2] He is not a citizen of, nor does he have a visa to work in any other country. *Id.* Respondent Abigail Sender is a United States citizen. She was born and raised in the United States and attended medical school beginning in 1999 at McGill University in Montreal, Quebec. *Id.* She was formerly a permanent resident of Canada. At one time she applied for, but never received, Canadian citizenship. *Id.* Hofmann and Sender met and began dating while they were residing in Montreal and serving as medical residents at McGill. *Id.* at 5. Both parties earned medical degrees that are recognized as the equivalent of a comparable degree in the United States. Hofmann, however, is unable to work in the United States due to his immigration status. In Montreal, the parties attended the Spanish and Portuguese Synagogue. They were married there in February 2008 and lived together in Montreal as husband and wife until May or June of 2011. *Id.* at 5-6. Their first son, R, was born in Montreal in January, 2009. *Id.* at 6. After the baby's

---

[2] ROA 28 ("Doc. 28") is the transcript of the district court's oral decision in the case rendered December 17, 2012. It was published to the district court docket 12-cv-08104 as docket entry number 28.

birth, Sender traveled to New York so that her family could help her care for the child. *Id.* In the fall of 2009, Hofmann took two months of unpaid leave in order to spend time with his wife and child at the home of his in-laws in New York. *Id.* At that time, Hofmann and Sender discussed their marital difficulties, including problems they were having with their families. They also discussed the possibility of having a second child and of relocating outside of Canada. *Id.* They took various trips to communities in New York and New Jersey in order to see whether any would make a suitable future home. They were particularly concerned about finding an Orthodox Jewish community where they could raise their family. *Id.* at 7. Hofmann and Sender returned to Montreal with their son later in 2009, but they kept open the possibility of relocating to New York at some point in 2010. *Id.*

Around this time, the relationship between the parties' families broke down entirely. As a result, Hofmann cut all ties with his immediate family, stopped speaking with his parents, and did not attend his brother's wedding. *Id.* In the summer of 2010, Hofmann and Sender both finished their medical training, and Hofmann received an offer to work at Sacre-Coeur Hospital in Montreal. Sender agreed that Hofmann should accept the position because of his interest in working in an academic institution and the possibility that he could "moonlight" at other hospitals. *Id.* Hofmann and Sender also continued to discuss a possible relocation to the United States. Toward this end, Hofmann exchanged emails with recruiters and other doctors in order to explore opportunities for work in the United States. *Id.* ex. BL, BM. The parties, however, did not make a final decision to relocate at any point in 2010, and at that time Hofmann took no steps to obtain legal resident status in the United States. Sender continued to travel to New York and New Jersey to look at schools and communities that might suit the parties' needs if they were to relocate. *Id.* at 9.

The lease for the parties' Montreal apartment, where they had resided since their wedding, expired in the summer of 2011. Hofmann's employment with Sacre-Coeur Hospital also ended around the same time, and the parties moved to another apartment in Montreal. The new apartment was less expensive, but was still close to the Spanish and Portuguese Synagogue. On July 19, 2011, the parties' second son, A, was born in Montreal. At some point that summer, the parties decided that Sender would take the children to stay for a prolonged period at her parents' home in Rifton, New York in order that her parents could help with the children. Doc. 28 at 9. On August 15, 2011, Sender and the children departed for New York, taking with them certain personal and family belongings for their stay. Hofmann switched to a position covering for doctors who had gone on leave so that he could have more flexibility to spend time with his family in New York. The new position was less prestigious than his former academic career path, but it allowed him to spend approximately half of his time with his wife and children in Rifton.

In the hearing before the district court, the parties vigorously contested the purpose of the trip to Rifton. Hofmann asserted that the trip was intended as a temporary visit, and that Sender and the children intended to return to Montreal after the winter. Doc. 28 at 10. Sender, by contrast, claimed that the move to Rifton was the first step in the family's permanent relocation to New York. *Id.* On this point, the district court found that Sender's testimony was "specific and in large part credible," *id.*, noting that Sender's testimony was supported by the actions of the parties, which included moving clothes, toys, and other essentials to Rifton, consistent with a lengthy stay. After Sender had gone to New York, Hofmann periodically brought more of his and Sender's belongings to her parents' home in Rifton. The district court found that the second Montreal apartment did "not seem suitable for a long-term family residence," because of its

5

smaller size. *Id.* at 10-11. The parties made renovations to a room in Sender's parents' house in order to accommodate their family for an extended period of time. *Id.* at 11.

In September 2011 the parties opened a joint bank account in New Paltz, New York. Between the end of 2011 and the beginning of 2012 they transferred over $200,000 to that account. *Id.* Their older son, who was three at the time, began attending classes in New York. *Id.* The district court found, however, that the parties had not "reached the unequivocal decision to relocate to New York," by August 15, 2011. *Id.* at 12. Although Sender had abandoned her pursuit of Canadian citizenship by this point, the court found that as late as November and December of 2011, the parties were still considering the possibility of permanently settling in a new residence in Montreal. *Id.* The evidence showed that the parties had no intent of residing permanently in Rifton because it does not have an Orthodox community or an Orthodox school for the parties' children, and until August 2012, Sender had not found a permanent residence in New York.

Sender returned to Canada "at least once in the fall of . . . 2011 and once in the winter of 2011/2012." In the fall of 2011, Sender renewed her Quebec car insurance. During Sender's 2012 visit, Hofmann and Sender "met with an attorney to execute a divestiture of assets that [Hofmann] held" in a company owned by his family. *Id.* at 12. In the fall of 2011 and the winter of 2012, Sender also continued to receive certain tax credits and maternity leave from her job in Montreal. Those "payments were predicated precisely on the understanding that she would return to the job at some point in the future." *Id.* at 13 citing Ex. 57.

On this record, the district court determined that Hofmann had "acquiesced" to the children's removal to New York in August of 2011. The court also found "that until September 2012, the parties believed that, if they were relocating permanently to New York . . . they were

doing [it] as a family." *Id.* at 13. The court determined that while this condition may not have been expressly stated, "it was understood by the parties, and it certainly was understood by [Hofmann]." In the court's view, "both petitioner and respondent specifically and persuasively testified to their shared understanding of this condition." *Id.* On direct examination, Hofmann "testified that he consented to respondent's travel to New York with the children based on his understanding that he . . . and the children, would stay as a family . . . 'come what may.'" The court found this statement was consistent with Hofmann's other actions including his institution of this Hague Convention proceeding immediately after he was served with divorce papers. Similarly, the court found that Sender "testified, both on direct and on cross [examination], that it was her understanding and assumption that she and [Hofmann] were relocating to New York as a family." Sender admitted on cross examination that "the only reason" Hofmann had allowed her to take the children to New York in 2011 was his belief that he would remain part of the family. She also stated that the parties had agreed to move to New York as a family, and that it was an attempted "rebirth" of their marriage. *Id.* at 14.

Throughout the spring of 2012, the parties continued to search in New York for a suitable community for the family and a suitable school for the children. *Id.* at 15. Hofmann continued his work "moonlighting" at the hospital in Montreal but did not take a permanent position. *Id.* at 14-15. Hofmann paid Canadian income taxes, while Sender filed tax returns in both Canada and the United States. *Id.* at 15. In February or March of 2012, Sender cancelled her Quebec health insurance, informed her employer that she would not be returning to work, and repaid $25,000 to the insurance plan. *Id.* at 16. Hofmann continued to make regular trips to New York to visit his family, and in the spring the parties' older son was accepted for enrollment at Breuers Yeshiva in

New York. *Id.* at 16. In May of 2012, the parties shipped their belongings to a storage unit in New York. That year Sender filed tax returns only in the United States. *Id.*

Between February 14, 2012 and September 5, 2012, Sender was indicating to Hofmann that she was looking for a suitable family home in the metro New York area. *Id.* In the summer of 2012, however, Sender had become increasingly discontent in her marriage and began to speak with divorce attorneys. In August, she found a home for herself and the children near the school the parties had selected. Throughout this period the parties and their children, sometimes accompanied by Sender's mother, continued to go on family vacations on the weekends. *Id.* Sender never mentioned the possibility of divorce to Hofmann, and, in fact, she took pains to hide the fact that she was seeing attorneys, including making all attorney's fee payments in cash. *Id.* at 16-17. At some point in 2012, the parties spoke to an attorney in New York about changing their family name. "Both the parties signed forms explaining that their intent in changing their and their children's names was to separate themselves further from a family situation, obviously from petitioner's family." *Id.* at 18 (citing exhibits N, O, and P). Sender and the children's last names were changed to "Sender," and R's middle name was also changed. Hofmann could not change his last name because he lacked legal status in the United States. *Id.* at 19.

Hofmann continued to pursue a path to achieving legal status in the United States, and as late as August of 2012 he had contacted at least two immigration lawyers regarding his obtaining American citizenship. There was conflicting testimony as to whether Sender had stalled Hofmann's attempts to obtain a green card that would have been based on his marriage to her, and Sender testified that she had at various times agreed to sponsor Hofmann for family-based immigration status. She also testified that she encouraged Hofmann to "consider other options,

including . . . a work visa." *Id.* at 17. Ultimately, Hofmann never obtained any sort of legal status in the United States that would have permitted him to work here. *Id.*

In late August 2012, Sender retained counsel for the divorce proceeding against Hofmann. *Id.* at 19. The next day, she "requested that [Hofmann] expedite delivery of documents that would allow her, acting unilaterally, to change the children's names on their U.S. Passport[s]." *Id.* at 19 citing Ex. 45. She claimed the documents were needed so that the passports could be used to enroll R at Breuers. The district court found, however, that Sender "asked for these documents in an attempt to complete the name change before [Hofmann] realized that [she] was going to seek to divorce him and seek custody of the children."[3] *Id.* at 19.

In August 2012, the parties went on their last vacation as a family even though at this point Sender had already decided to divorce Hofmann. The district court found, based on the parties testimony, that at the "end of the vacation, [Sender] kissed [Hofmann] on the cheek goodbye before he drove back to Montreal." *Id.* at 20. Sender asked Hofmann to return to the United States on September 4 and 5. Hofmann "was told to meet [Sender] at a specific hotel in New Jersey, and [Sender] also told [Hofmann] he was coming to join the family for [R's] first day of school." *Id.* When Hofmann arrived at the hotel in New Jersey, his family was not there. Instead he was served with divorce papers while he stood in the parking lot of the hotel. *Id.* Hofmann returned to Canada and filed with the Canadian Central Authority the Hague

---

[3] As the district court noted, at the time Sender requested Hofmann to send both children's passports, A was too young to begin attending school. That fact supports the district court's finding that Sender's stated reason for needing the documents was mere pretext and that she was really acting out of a desire to complete the children's name change before she initiated divorce proceedings.

9

Convention petition for return of the children to Canada, which is the subject of our present review.

Based on its findings of fact, the district court reached the following conclusions: the parties' children were habitually resident in Canada; and although Hofmann had consented to the children's removal to the United States, that consent was a conditional one, contingent on his accompanying them and residing with them and Sender as a family in the United States. *Id.* at 22-23, 24. The district court found, therefore, that the parties' last shared intent with respect to the children's residence was for the children to reside in Canada. *Id.* at 25 (citing *Mota v. Castillo*, 692 F.3d 108 (2d Cir. 2012)). *See also Baxter v. Baxter*, 423 F.3d 363, 369 (3d Cir. 2005). The district court also concluded that the children had not become so acclimated to New York that a return to Canada would be harmful to them, Doc 28 at 28-29, and because the wrongful retention of the children under the Hague Convention occurred on September 5, 2012, when Sender had Hofmann served with divorce papers, *id.* at 30, the affirmative defense that the children were well settled in the United States did not apply. *Id.* at 31-32. Largely for the reasons on which it based its determination of the children's habitual residence, the district court also found that the affirmative defenses of consent and acquiescence did not apply. *Id.* at 30-31. The court thus granted Hofmann's petition and ordered that the children be returned to Canada, enabling the Canadian courts to determine issues of parental custody. Subsequently, the Quebec Superior Court, Family Division issued an order granting temporary sole custody to the Respondent-Appellant Sender and directing that the children be returned to New York. A further hearing is scheduled in Montreal on May 23, 2013. The Quebec Superior Court awarded Petitioner-Appellee Hofmann visitation and phone access rights.

On appeal, Sender argues primarily that the district court committed clear error when it found that Hofmann's agreement that the children move to the United States was conditioned upon their residing together as a family in the United States. She asserts, in substance, that the district court was wrong in its analysis of the evidence. Sender contends that the parties, in fact, shared the intention to relocate to New York and that there is no evidence to support the district court's conclusion that Hofmann's consent was conditional in any way. In a similar vein, she asserts that because she and her husband had begun the process of moving from Montreal to New York, which included her taking the children to reside in New York while Hofmann continued to try to move there, that was sufficient to establish the parties' joint intention that the children were to reside in New York. She contends, moreover, that if this court were to accept the district court's determination that a conditional consent controlled the determination of a child's habitual residence, it would "effectively preclude[] married couples that have consented to relocate [from one country to another] from ever separating or dissolving their union, lest one of the parties claim that remaining married with the family fully intact was an implied condition precedent to the consent to relocate." Sender also asserts that the children are now so well settled in the United States that under the Hague Convention their habitual residence has changed. She argues that the district court's decision is contrary to the purposes of the Hague Convention, and that certain affirmative defenses available under the Convention should apply. For the reasons set forth below, we disagree.

## II. Jurisdiction

Although neither party to this appeal has raised the issue before this court, it was raised before the district court, and we have an obligation to examine our jurisdiction *nostra sponte*. *Kalson v. Paterson*, 542 F.3d 281, 286 n.10 (2d Cir. 2008). Thus, we consider whether the

return of the children to Canada pursuant to the district court's January 16, 2013, order renders this case moot. *See, e.g., Beiker v. Beiker*, 248 F.3d 1051, 1055 (11th Cir. 2001) (holding that child's return to Israel rendered appeal of district court's decision under the Hague Convention moot); *see also Whiting v. Krassner*, 391 F.3d 540, 545 (3d Cir. 2004) (recognizing circuit split on the issue of whether child's return to the country of habitual residence outside of the United States rendered an appeal moot). The Supreme Court has now decisively answered that question in *Chafin v. Chafin*, where it held that although "[t]he Hague Convention mandates the prompt return of children to their countries of habitual residence[,] . . . such return does not render th[e] case moot; there is a live dispute between the parties over where their child[ren] will be raised, and there is a possibility of effectual relief for the prevailing parent. The courts below therefore continue to have jurisdiction to adjudicate the merits of the parties' respective claims." *Chafin v. Chafin*, 133 S.Ct. 1017, 1028 (2013). In line with *Chafin*, therefore, we hold that the fact that the parties' children have already been returned to Canada pursuant to the district court's order does not render this appeal moot. It remains a live case and controversy. *Id.*

### III. Discussion

The Hague Convention on Civil Aspects of International Child Abduction "seeks to secure the prompt return of children wrongfully removed to or retained in any Contracting State, and to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States." *Abbott v. Abbott*, 130 S.Ct. 1983, 1989 (2010) (internal quotation marks omitted). The United States is a Contracting State to the convention, which has been implemented domestically by ICARA, 42 U.S.C. § 11601 *et seq.* (2000). *Abbott*, 130 S.Ct. at 1987. The central remedy under the Convention is the return of the child. *Abbott*, 130 S.Ct. at 1989. "When a child under the age of 16 has been wrongfully

12

removed or retained, the country to which the child has been brought must order the return of the child forthwith, unless certain exceptions apply." *Id.* (internal quotation marks omitted). "To that end, ICARA provides that '[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for arrangements for ... securing the effective exercise of rights of access to a child may do so by commencing a civil action' in a state or federal court 'in the place where the child is located at the time the petition is filed.'" *Mota v. Castillo*, 692 F.3d 108, 112 (2d Cir. 2012) (quoting 42 U.S.C. § 11603(b)).

Article 3 of the Convention provides that:

[t]he removal or the retention of the child is to be considered wrongful where –

a. it is in breach of the rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and

b. at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

*Abbott*, 130 S.Ct. at 1989 (quoting the Hague Convention Article 3). Thus, a petitioner under the Hague Convention must demonstrate by a preponderance of the evidence that "(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner's custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention." *Gitter v. Gitter*, 396 F.3d 124, 130-31 (2d Cir. 2005).

We turn first to issues raised under subsection b of Article 3 and the third element identified in *Gitter*. The parties do not dispute that Hofmann had custody rights under Quebec law, recognized by the Convention, which he was exercising at the time the children were

13

retained by Sender. Doc. 28 at 29. The district court found that Hofmann's multiple visits to New York as well as his participation in family vacations demonstrated that he was exercising his custodial rights up to the time the divorce proceedings were initiated. *Id.* at 29-30. In sum, the district court concluded that Hofmann had initially consented to the children's removal from Quebec as part of the anticipated change in residence but that Sender's retention of the children became wrongful once she sought to prevent Hofmann from exercising his custody rights under Quebec law. *Id.* at 29-30; *see also Baxter*, 423 F.3d at 369. Each of these conclusions finds sound support in the record, including Hofmann and Sender's recounting of their discussions throughout 2011 and 2012 concerning the best location to raise their family and the various steps taken to relocate together to the United States. Until September 5, 2012, when Sender unilaterally initiated divorce proceedings and deprived Hofmann of access to the children, Hofmann was involved in each of these family decisions, including where his children would be sent to school, where the family would vacation together, and in what type of community the family would live. We see no reason to disturb these findings on appeal. *See e.g. Abbott*, 130 S.Ct. at 1990 ("The convention defines 'rights of custody' to 'include rights relating to the care of the person of the child and, in particular, the right to determine the child's place of residence.'" (citing the Hague Convention Art. 5(a)).

To determine which country is a child's country of habitual residence under the Hague Convention, we apply the two-part test set forth in *Gitter v. Gitter*. There we held that:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has

14

> acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134. A district court's findings of fact under the convention are reviewed for clear error. *Mota*, 692 F.3d at 114. We review *de novo* the district court's interpretation of the Convention, and its application of the Convention to the facts. *Id.* at 111.

As we have previously held, "our primary consideration in determining a child's place of habitual residence is the shared intention of the child's parents at the last time that their intent was shared." *Id.* at 113-114 (internal quotation marks omitted). The last shared intent of the parents is a question of fact, and the district court's determination in that regard is reviewed for clear error and thus entitled to deference. *Id.* at 114. Decisions relating to the credibility of witnesses and the relative weight of their testimony are properly left to the discretion of the trier of fact. *See, e.g. Design Strategy, Inc. v. Davis*, 469 F.3d 284, 300 (2d Cir. 2006). Here, the district court determined, after careful weighing of the evidence and assessment of the parties' credibility, that the last shared intent of the parties was that the children would reside in Canada. Doc. 28 at 22. Correlatively, the court also found that at the time the parties were transitioning from Montreal to New York, Hofmann only intended the children to reside habitually in New York if he was also resident in New York with his children and his wife, as a family. *Id.* at 24.

The district court's decision was amply supported by the record, and there is nothing that would leave us with "'the definite and firm conviction that a mistake has been committed.'" *Mota*, 692 F.3d at 114 (quoting *Bessemer Trust Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010)). The district court spent significant time taking testimony and reviewing the evidence presented. It is clear from that court's thoughtful analysis that there is no basis to disturb its findings of fact.

We turn now to the law applicable to the resolution of this issue on appeal. In *Mota*, we considered whether the father's retention of a child was wrongful under the Hague Convention

15

when the mother's consent to the child coming to the United States was conditional, based on the mother's also being able to join the child and the father in this country. In that case the child, Elena Mota, lived with her mother in Mexico until approximately the age of three. *Mota*, 692 F.3d at 110. When Elena was six months old, her father had entered the United States illegally to find work. In the spring of 2010 the family decided to attempt to reunite in New York. *Id.* The plan was to pay to have Elena smuggled across the border. *Id.* The mother would then attempt to cross the border herself, and mother and child would travel together to New York. *Id.* Elena was successfully smuggled into the United States, but her mother was unable to cross the border. *Id.* Elena was reunited with her father, who proceeded to keep her in New York. He subsequently took up residence with another woman, and he stopped sending money to Mexico to support Elena's mother. *Id.* at 111. Elena's father then refused to return her to Mexico, and her mother filed a petition pursuant to Article 3 of the Convention seeking her return.

On appeal, we held that the record supported the district court's determination that the mother's consent to Elena's remaining in New York was conditioned on the mother, father and Elena's living in New York together. *Id.* at 115. Acknowledging the effect of the unmet condition precedent, we affirmed the district court's determination that the last shared intent of the parents regarding Elena's residence was that she live in Mexico. For purposes of the Convention, therefore, Mexico was the "State in which the child was habitually resident." Hague Convention Art. 3.

Our decision in *Mota* directly controls the outcome in this case. As the district court here has found, "the petitioner has demonstrated by his testimony and his actions that he intended for the children to relocate to New York on the condition that he would join the household and continue to be the father to his children and the husband to his wife." Doc. 28 at 24. Just as in

16

*Mota*, "if the parents [here] did not agree that [the children] would live indefinitely in . . . [the

United States] regardless of [their father's] presence, it cannot be said that the parents 'shared an

intent'" that New York would be the children's "state of habitual residence." *Mota*, 692 F.3d at

115. There is evidence in the record, including testimony from both parties, that they intended to

relocate to New York as a family to enable the "rebirth" of their marriage. They therefore had a

shared intent to relocate to New York, but the extent to which that intent was shared was limited

by Hofmann's conditional agreement that the relocation was to be accomplished as a family. In

the summer of 2012, before the family relocation was complete, Sender developed the unilateral

intention to reside in New York with the children but without Hofmann. Sender's unilateral

decision to retain the children in New York without their father thus precluded satisfaction of the

condition on which Hofmann's shared intent was based. The district court properly determined

under the Convention that the parties' last shared intention regarding the children's residence

was that they live in Canada and for that reason the habitual residence of the children remained

in Canada. *See Nicolson v. Pappalardo*, 605 F.3d 100, 105 (1st Cir. 2010) ("Standing alone, of

course, the mother's intent that the child[ren] should one day live in the United States could not

support a finding of habitual residence." (internal quotation marks and alteration omitted)).[4]

---

[4] Sender argues that, if we were to take the district court's finding of conditional consent "to its logical yet not untenable [sic] conclusion, . . . [it] effectively precludes married couples that have consented to relocate from ever separating or dissolving their union, lest one of the parties claim that remaining married with the family fully intact was an implied condition precedent to the consent to relocate, thereby rendering the earlier consent a nullity." This argument is patently flawed, in that once the family had established itself in the new country of residence, with a sense of settled purpose, the habitual residence of the children would shift to the new country of residence. Additionally, if the parties were both to remain in the new country of residence during their custody proceedings, the provisions of the Hague Convention would not be implicated. In this respect, Sender's reliance on *Halaf v. Halaf*, 2009 WL 454565 (E.D.N.Y. Feb. 24, 2009) is also misplaced. In *Halaf*, both parents moved together with their child from Israel to the United States, establishing a family home in New York. *Halaf*, 2009 WL 454565 at *3-4. Only *after* the family had established their joint residence did the petitioner make the

17

Turning to the second prong of the *Gitter* analysis, having concluded that the children were properly determined to be habitually resident in Canada, we "inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' last shared intent."[5] *Gitter*, 396 F.3d at 134. "[C]ourts should be 'slow to infer' that the child's acclimatization trumps the parents' shared intent." *Id.* (quoting *Mozes v. Mozes*, 239 F.3d 1067, 1079 (9th Cir. 2001)). As we noted in *Mota*, "[i]t would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land, and retaining her there long enough to amass evidence of the child's acclimatization to the new location." *Mota*, 692 F.3d at 116. A finding that this standard is satisfied is therefore only appropriate "in 'relatively rare circumstances' in which a child's degree of acclimatization is 'so complete that serious harm . . . can be expected to result from compelling his [or her] return to the family's intended residence.'"

---

unilateral decision to return to Israel. *Id.* The district court in that case found that the habitual residence of the child was in New York, not Israel. *Id.* at *8. *Halaf* is thus easily distinguished from this case where Hofmann and Sender never actually established a family residence in New York, and Sender instead unilaterally found a home only for herself and the children.

[5] We note that the second prong of the *Gitter* analysis seems to address the same concerns as the "now-settled" defense found in Article 12 of the Hague Convention. *Compare Gitter*, 396 F.3d at 134, (holding that "the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent") *with* Hague Convention Art. 12 (stating that a court is not obligated to order the return of a child to its habitual residence where a petition is filed more than one year since the wrongful removal or retention and the child is now settled in its new environment). Hypothetically, these ostensibly parallel analyses could allow for a finding that a child has become well settled in its new country before the one year time limit in Article 12 has elapsed. Because we rely solely on temporal grounds in holding that the mandatory provisions of Article 12 are not satisfied, and also hold that Respondent Sender has not demonstrated that the children have become acclimatized to their home in New York such that they have acquired a new habitual residence under *Gitter*, we leave for another day any potential conflict that may exist.

*Id.* (quoting *Gitter*, 396 F.3d at 134). *See also Mozes*, 239 F.3d at 1081 ("The question in these cases is not simply whether the child's life in the new country shows some minimal 'degree of settled purpose,' . . . but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." (internal quotation marks and citation omitted)).

In the case before us, despite Sender's urging to the contrary, it is clear that the children have not become so acclimatized to life in New York that returning them to Canada would be tantamount to removing them from the environment where their lives have developed. *See Mozes*, 239 F.3d at 1081. While, at this point, the children have resided in New York for over a year, they have moved and changed communities within New York recently. Although R is enrolled in school, he recently had close ties to friends and caretakers in Canada, and A is a toddler, unlikely to suffer significantly from a change in his environment. There is no basis to conclude that the district court clearly erred in finding that the children were not so acclimatized to life in the United States that a return to Canada would be harmful to them. Doc. 28 at 28.

Having affirmed the district court's determination that Hofmann satisfied his burden to prove a *prima facie* case of wrongful retention under Article 3 of the Convention, we turn now to consider Sender's arguments that the district court erred when it denied her relief under the affirmative defenses in Articles 12 and 13 of the Convention. Article 13 of the Convention provides that "the judicial or administrative authority of the requested State is not bound to order the return of the child if . . . the person . . . having care of the person of the child . . . consented to or subsequently acquiesced in the removal or retention." As laid out above, although Hofmann initially consented to the children's removal to the United States, that consent was conditioned

19

upon his accompanying them and residing in this country as a family with his children and wife. "Article 13(a) does not provide that if a parent consents to removal of the child for a period, under certain conditions or circumstances, that retention of the child beyond those conditions or circumstances is necessarily permissible." *Baxter*, 423 F.3d at 370. Because the condition on which Hofmann consented to his children moving to the United States was not met, there is no basis to conclude that he consented to Sender's retention of the children in the United States. The potential defense under Article 13 of the Convention has no application to the facts of this case. *See id*; *Mota*, 692 F.3d at 117 (Finding that petitioner's "consent to her daughter's relocation was conditioned upon her own ability to join the father and daughter in New York," and that "[t]he failure of this condition annulled [petitioner's] consent.").

Finally, Sender's reliance on the "now settled" exception contained in Article 12 of the Convention is similarly unavailing. Article 12 provides, in relevant part, that:

> Where a child has been wrongfully removed or retained in terms of Article 3 and, at the date of the commencement of the proceedings before the judicial or administrative authority of the Contracting State where the child is, a period of less than one year has elapsed from the date of the wrongful removal or retention, the authority concerned shall order the return of the child forthwith.
>
> The judicial or administrative authority, even where the proceedings have been commenced after the expiration of the period of one year referred to in the preceding paragraph, shall also order the return of the child, unless it is demonstrated that the child is now settled in its new environment.

T.I.A.S. No. 11670. By its terms, the "now settled" exception only applies where the child has been in the destination state for more than one year from the date of the wrongful removal or retention. For the reasons set forth above, the date of wrongful retention in this case is September 5, 2012, when Sender initially retained the children in the United States in violation

of Hofmann's custodial rights. [6] Because one year had not elapsed between the wrongful

retention of the children and the institution of these proceedings under the convention, the

district court's determination that the "now settled" exception does not apply must be affirmed.

### IV. Conclusion

In light of the above analysis, we hold both that Hofmann has successfully proven his

*prima facie* case under Article 3 of the Convention, and that Sender has failed to prove any

affirmative defense. We have considered all of Sender's remaining arguments and find them to

be without merit. The district court's thorough and well-reasoned opinion is affirmed.

---

[6] Although Sender argues that the wrongful retention or removal should effectively date back to August 2011, when the children first entered the United States without their father, this argument disregards the district court's clear finding that Hofmann's custody rights were not interrupted until September 5, 2012. Allowing Sender to claim that the children's removal under the Convention should retroactively begin in August of 2011 flies in the face of the facts that Hofmann had full access to his children and no notice that the condition pursuant to which the children were moved to the United States was not going to be fulfilled. Moreover, the absence of such notice back in August 2011 would effectively deprive Hofmann of timely notice that his rights under the Convention may be impaired. It is therefore clear that removal or retention of the children in the United States was not wrongful until Hofmann was on notice that he was prevented from exercising his custody rights. That did not occur until September 5, 2012.