OPINION OF THE COURT
Paul, A. Goetz, J.
Petitioner mother, MG, obtained an order of custody on default on April 11, 2011, granting custody of the child DZ (the child), date of birth March 24, 2004, to petitioner. Respondent father, WZ, filed a motion on April 10, 2012, seeking an order reopening the order of custody on default and allowing him to proceed on his petition for return of the child to the Dominican Republic pursuant to the Hague Convention on the Civil Aspects of International Child Abduction (the Hague Convention) (TIAS No. 11670, 1343 UNTS 89 [1980]), as implemented by the International Child Abduction Remedies Act (42 USC § 11601 et seq., editorially reclassified at 22 USC § 9001 et seq.). By decision and order dated September 26, 2012, the court granted respondent’s motion to reopen the default judgment, and vacated the April 11, 2011 order of custody on default and set the matter down for further proceedings on the respondent’s petition for return of the child under the Hague Convention and petitioner’s petition for custody.
The court appointed an attorney for the child, who does not support respondent’s petition for return of the child under the Hague Convention.
Both parties were represented by counsel at the hearing on respondent’s Hague Convention petition on March 27, 2013, and continued on July 26, 2013, September 12, 2013, September 25, 2013, September 26, 2013, November 29, 2013, January 9, 2014, January 10, 2014, February 20, 2014, April 21, 2014, and April 23, 2014.[1] Upon respondent’s application, the court permitted respondent to testify and participate in the hearing *374 via video hookup from the Dominican Republic. [2] On July 15, 2014, the court conducted an in camera interview with the child.
At trial, in addition to the parties, the following individuals testified: on behalf of respondent, the paternal grandmother, CR, and Rebania Sanchez-Camacho, an expert in Dominican Republic child custody law.
For the reasons that follow, the court denies respondent’s petition for return of the child under the Hague Convention.
Findings of Fact
The Parties’ Interactions from 2004 Until May 2010 When the Child Came to the United States
The parties started residing together in 2004 in the Dominican Republic after resuming a romantic relationship that had ended some time before 2004. By 2004, petitioner had a three-year-old-non-subject son, A. Petitioner and A moved in with respondent and his family (paternal grandmother, paternal grandfather SA, paternal great grandmother D, and respondent’s brothers, AA, PA and SA). Both parties were working at the time and when the child was born in March 2004, petitioner took approximately three-months maternity leave. The paternal grandparents paid the prenatal and medical bills connected with petitioner’s pregnancy and the child’s birth. When petitioner returned to work, the paternal grandmother cared for the child while petitioner was at work.
Prior to the child’s birth, petitioner told respondent of her plans to move to the United States. In September 2004, petitioner immigrated to the United States where she is now a *375 legal resident, leaving the child and A in the paternal grandmother’s care. Prior to coming to the United States, petitioner told respondent of her plan to obtain employment in the United States and then petition to have respondent and the children join her. Respondent rejected petitioner’s plan for the parties and the child to live together in the United States because he had his own plan. Respondent’s plan was to find a United States citizen to marry and then immigrate with the child to the United States after the marriage. Respondent preferred this plan of action for he and the child to move to the United States because he thought it would take less time.[3]
In March 2005, petitioner returned to the Dominican Republic for two to three months and stayed with respondent and his family. The parties were still involved in a relationship when petitioner returned in March 2005 but respondent’s family would not allow petitioner to leave their home with the child. On one occasion, petitioner left the home of respondent’s family with the children and when she returned there was a physical altercation between petitioner and respondent’s brothers. The paternal grandparents intervened and took petitioner and the children to petitioner’s grandmother’s home (the child’s maternal great grandmother).
In the beginning of 2006, the parties ended their relationship and, shortly thereafter, petitioner returned to the Dominican Republic for three weeks to a month and stayed with the maternal great grandmother. While petitioner was in the Do *376 minican Republic in 2006, the paternal grandmother petitioned for and was granted guardianship of the child. Petitioner consented to the paternal grandmother having guardianship of the child but respondent did not consent. Respondent did not pursue the legal remedies available to him in order to obtain custody of the child after the paternal grandmother was granted guardianship. While petitioner was in the Dominican Republic during this period, she wanted the child to stay with her at the maternal great grandmother’s but because the child was not yet two years old and had been living with the paternal grandmother, petitioner felt it best not to remove him from the paternal grandmother’s home.
Petitioner waited for respondent to follow through on his plan to marry a United States citizen in order to immigrate to the United States and when he failed to do so, petitioner started the process to petition for the children to join her in the United States sometime in 2006. Although respondent was initially upset that petitioner took matters into her own hands by filing a petition to have the child join her in the United States, also in 2006, respondent consented to the child coming to the United States with petitioner.[4] The parties did not discuss the child coming to the United States again until May 2010.
Petitioner returned to the Dominican Republic in 2007, 2008, and 2009 for approximately two weeks each year and stayed with the maternal great grandmother. Petitioner had difficulty gaining access to the child during these visits and when she did gain access, respondent and his family often prevented her from spending time alone with the child. Despite her difficulties gaining access to the child, petitioner sent the paternal grandmother food and money for the child’s care while the child was in the paternal grandmother’s care.
In May 2010, petitioner traveled to the Dominican Republic and returned to the United States with the child. Petitioner testified that she needed respondent’s permission in order to leave the Dominican Republic with the child and there is no dispute that respondent gave his written consent for the child *377 to travel to the United States. The night before petitioner left the Dominican Republic with the child, she and respondent agreed not to make a final decision on whether the child would remain in the United States rather than returning to the Dominican Republic. Instead the agreement was that they would wait to see if the child obtained his permanent residency and whether he was adjusting to and liked life in the United States.[5]
The Child’s Life in the United States
The child has been living in New York with petitioner and A since May 2010, and obtained his permanent residency status in October 2010. The child has not been back to the Dominican Republic since he left in May 2010.
The child has been enrolled in P.S. 227 in the Bronx since 2010 where he has been consistently receiving high grades. The child has been enrolled in a community based baseball league. The child also enjoys playing basketball and will be enrolled in a community based basketball league. English is now the child’s dominant language although petitioner and the child more often communicate in Spanish. The child has many school friends, and enjoys watching cartoons in English.
Petitioner works as a cashier and receives food stamps and Medicaid for herself and the children. Petitioner’s mother (the child’s maternal grandmother) lives five blocks from petitioner and the child with two of the child’s uncles and cousins. The child has an aunt who has two children who live in the Bronx and another married aunt who has three children. All of these family members are on petitioner’s side of the family and live in the Bronx. The child spends a great deal of time with his extended family.
Analysis
Under the Hague Convention as implemented by the International Child Abduction Remedies Act,
“[w]hen a child under the age of 16 has been wrongfully removed or retained, the country to which the *378 child has been brought must ‘order the return of the child [to the country of its habitual residence] forthwith,’ unless certain exceptions apply. A removal is ‘wrongful’ where the child was removed in violation of ‘rights of custody.’ The Convention defines ‘rights of custody’ to ‘include rights relating to the care of the person of the child and, in particular, the right to determine the child’s place of residence.’ ” (Abbott v Abbott, 560 US 1, 9 [2010] [citations omitted].)
“Determine” can mean to fix conclusively or authoritatively, but it can also mean to set bounds or limits. (Abbott v Abbott, 560 US at 11.) For example, a parent can agree to the relocation of a child to a new country upon certain conditions or contingencies being met, in other words, a conditional agreement is reached to relocate the child between the parents. (See Hofmann v Sender, 716 F3d 282, 293 [2d Cir 2013].)
“The Convention recognizes that custody rights can be decreed jointly or alone.” (Abbott v Abbott, 560 US at 11.) A parent’s ne exeat joint right to decide a child’s country of residence gives him custody rights within the meaning of the Convention. (Id.)[6]
“[A] petitioner under the Hague Convention must demonstrate by a preponderance of the evidence that ‘(1) the child was habitually resident in one State and has been removed to or retained in a different State; (2) the removal or retention was in breach of the petitioner’s custody rights under the law of the State of habitual residence; and (3) the petitioner was exercising those rights at the time of the removal or retention.” (Hofmann v Sender, 716 F3d 282, 291 [2d Cir 2013], quoting Gitter v Gitter, 396 F3d 124, 130-131 [2d Cir 2005].)
“[W]here the proceedings [for return of a child] have been commenced after the expiration of the period of one year [from the date of the wrongful removal (or retention)], [the court] shall . . . order the *379 return of the child, unless it is demonstrated that the child is now settled in its new environment.” (Lozano v Montoya Alvarez, 572 US 1, —, 134 S Ct 1224, 1229 [2014], quoting Hague Convention art 12, TIAS No. 11670, 1343 UNTS 89.)
The “abducting parent” must establish that the exception to the return applies by a preponderance of the evidence. (Id.) Thus, the one-year period is not a statute of limitations. (572 US at —, 134 S Ct at 1234.)[7]
Courts apply a two-part test to determine a child’s country of habitual residence.
“First, the court should inquire into the shared intent of [the parents] at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents’ latest shared intent.” (Hofmann v Sender, 716 F3d at 291-292, quoting Gitter v Gitter, 396 F3d at 134.)
Here, the habitual residence of the child is the United States. Initially, the parties agreed that petitioner would precede the child to the United States and that respondent would follow by means of marrying a United States citizen who would then petition for he and the child to come to the United States. Respondent eventually did marry a United States citizen who petitioned for respondent to immigrate to the United States but according to respondent that petition was never granted and in 2012 he and his wife divorced.
Meanwhile, petitioner grew frustrated with respondent’s lack of progress with his plans for immigrating to the United States via marriage to a United States citizen and initiated the process to petition for the child to join her in the United States. While respondent was initially upset that petitioner filed a petition to have the child join her in the United States, he gave his writ *380 ten, unqualified consent for petitioner to travel with the child to the United States on May 20, 2010. However, the night before petitioner left the Dominican Republic with the child in May 2010, respondent’s unqualified or unconditional consent became conditional when the parties agreed that they would make a final determination on the child’s residency based on whether the child obtained his permanent residency and whether he was adjusting to and liked life in the United States. Thus, the last time the parties shared their intent for the child’s place of residence, they conditionally agreed that it would be the United States. The condition on the child residing in the United States was that he would have to be granted permanent residency and he would have to be adjusting to and liking his life in the United States. (See Abbott v Abbott, 560 US at 11; Hofmann v Sender, 716 F3d at 293.)
The conditions placed on whether the child would permanently reside in the United States have been met. The child obtained his permanent residency status in the United States and he has fully adjusted to and enjoys his life in the United States. The court finds that the child has fully adjusted to and enjoys his life in the United States because he consistently receives high grades in school, plays community based league sports, speaks predominantly English, and lives with his half brother A and has many relatives within close proximity with whom he spends a great deal of time. Consequently, the child’s habitual residence is the United States since the last time the parties’ intent was shared, their shared intent was for the child to reside in the United States upon his obtaining that which he now has obtained, permanent residency, and a settled, enjoyable life in the United States. (Hofmann v Sender, 716 F3d at 293.)
Even if respondent had shown by a preponderance of the evidence that the child was a habitual resident of the Dominican Republic and that petitioner’s retention of the child in the United States was a breach of respondent’s right to determine the child’s country of residency, i.e., his custody rights, the court would not order the child’s return to the Dominican Republic. Respondent filed his petition for return of the child to the Dominican Republic on April 10, 2012. Petitioner brought the child to the United States in May 2010. Therefore, more than one year has passed since petitioner “retained” the child in the United States even assuming respondent did not expect the child to remain in the United States for more than three *381 months thereby, permitting the court to consider whether the child has settled into his new environment. (Lozano v Montoya Alvarez, 572 US at —, 134 S Ct at 1229.) As set forth above, petitioner has demonstrated by a preponderance of the evidence that the child is now settled, indeed thriving in his new environment. (See Taveras v Morales, 2014 WL 2038318, 2014 US Dist LEXIS 67892 [SD NY, Aug. 26, 2014, No. 13 Civ 7743(RA)]; In re D.T.J., 956 F Supp 2d 523 [SD NY 2013].)
Conclusion
Accordingly, it is hereby ordered that the respondent’s petition under the Hague Convention to return the child is denied.

. The court is cognizant of the tremendous amount of time, effort and resources expended by counsel and the court to date on the parties’ petitions. While the court’s September 26, 2012 decision and order states “the matter is to be set down for further proceedings on the Mother’s Petition for Custody and the Father’s Petition for return of the child under the Hague Convention,” on March 27, 2013, the first hearing date, the court indicated that “we’re on for a hearing on the father’s petition under the Hague Convention.” Neither the parties’ counsel nor the Attorney for the Child objected to *374 the court’s characterization of the hearing. Later, petitioner’s counsel objected to a question posed to respondent by his counsel on the grounds that “whether [respondent] is employed is irrelevant to the initial issue of whether or not the case of custody should be determined in [the] Dominican Republic.” At another point during the hearing the court reminded respondent’s counsel that “this is not a custody hearing.” Consequently, notwithstanding the amount of time, effort and resources expended to date on the parties’ petitions, the instant decision only resolves respondent’s Hague Convention petition and it does not resolve petitioner’s custody petition.

. In addition to respondent, respondent’s witnesses also appeared by video hookup. Malfunctions with the video hookup and coordinating dates and times with the court in the Dominican Republic where respondent and his witnesses appeared presented unique challenges to this court’s efforts to expeditiously conduct the hearing on respondent’s petition. Given these challenges, it was not possible to resolve respondent’s petition within six weeks of filing. (See In re D.T.J., 956 F Supp 2d 523, 549 n 6 [SD NY 2013]; Hague Convention art 11, TIAS No. 11670, 1343 UNTS 89.)

. Respondent testified at trial that he did not know petitioner was planning to move to the United States permanently. The court finds respondent’s testimony incredible because he claims that he thought petitioner was coming to the United States to obtain a “green card” and that she would then return to the Dominican Republic to live. Respondent’s version of what he thought petitioner was planning is not credible because he did not explain why petitioner would go to the trouble of obtaining legal residency in the United States only to return to live permanently in the Dominican Republic.
Similarly, respondent denied at trial that he had a plan to marry a United States citizen in order to gain legal residency for himself and the child. The court does not find respondent’s denial credible because at the end of 2005, respondent “met” his wife, AM, by looking at photographs provided to him by AM’s mother. AM lives in the United States and she and respondent were married at the end of 2006. Prior to marrying AM in the Dominican Republic, respondent had only seen her on four occasions. AM petitioned for respondent to come to the United States but respondent claims not to know the status of that application. Given these circumstances, the court concludes that respondent intended to marry a United States citizen in order to immigrate to the United States. Parenthetically, according to respondent, he and AM divorced in 2012.

. Respondent denied knowing that petitioner was going through the same process for the child that she went through for herself in 2004, despite going to the various government offices with petitioner and being familiar with the process, having seen petitioner and relatives petition for permanent residency-in the United States. The court does not find respondent’s denial credible. Moreover, the paternal grandmother also knew that petitioner was going through the same process for the child because she accompanied petitioner to the various government offices.

. The court did not find respondent’s assertion that he did not give permission to petitioner to travel with the child to the United States for the purpose of the child immigrating to the United States credible. Respondent did not purchase a return flight to the Dominican Republic for the child and did not ask petitioner to show him confirmation of a return flight for the child to the Dominican Republic. Indeed, respondent gave three different answers as to how long he thought the child would stay in the United States with petitioner: a few days, 15 days and no more than three months.

. Because petitioner admitted at trial that she needed respondent’s consent to remove the child from the Dominican Republic to bring him to the United States, the court finds that the parties had a ne exeat joint right to decide the child’s country of residence and thus respondent had custody rights within the meaning of the Convention. (Abbott v Abbott, 560 US at 11.) Consequently, petitioner’s counsel’s oral application at trial to dismiss respondent’s petition on the grounds that he did not have custody rights is denied.

. Because the one-year period is not a statute of limitations, petitioner’s counsel’s oral application to dismiss for respondent’s failure to file his petition within one year of the alleged wrongful retention is denied.