12-180-cv
Asuncion Mota v. Rivera Castillo

# United States Court of Appeals
## FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 24, 2012                    Decided:  August 15, 2012)

Docket No. 12-180

———————————

ANGELICA ASUNCION MOTA,

*Plaintiff-Appellee,*

v.

JOSE LUIS RIVERA CASTILLO,

*Defendant-Appellant.*

———————————

BEFORE: HALL, CARNEY, *Circuit Judges*, and BERMAN, *District Judge.*[*]

———————————

Appeal from a judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*), granting Plaintiff-Appellee Angelica Asuncion Mota's petition for the return of Elena Michelle Asuncion Rivera, her five-year-old child, to her custody in Mexico.  Applying the Hague Convention as implemented by the International Child Abduction Remedies Act and interpreted by our decision in *Gitter v. Gitter*, 396 F.3d 124 (2d Cir. 2005), we hold that Elena was a habitual resident of Mexico when her father, Defendant-Appellant Jose Luis Rivera Castillo, retained her in the United States in violation of Asuncion Mota's custodial rights under Mexican law.  Accordingly, Elena must be returned to Mexico for resolution of her parents' dispute over their respective custodial rights.

AFFIRMED.

———————————

[*] The Honorable Richard M. Berman, of the United States District Court for the Southern District of New York, sitting by designation.

CAROLYN A. KUBITSCHEK, Lansner & Kubitschek, New York, New York, *for Defendant-Appellant*.

CHRISTOPHER M. STRONGOSKY (Leeanne S. Neri, *on the brief*), DLA Piper US LLP, New York, New York, *for Plaintiff-Appellee*.

SUSAN L. CARNEY, *Circuit Judge*:

Elena Michelle Asuncion Rivera is the five-year-old daughter of Plaintiff-Appellee Angelica Asuncion Mota and Defendant-Appellant Jose Luis Rivera Castillo. Like her parents, Elena is a citizen of Mexico, the country of her birth. In 2007, when Elena was six months old, her father traveled from Mexico to New York to find work, and Elena remained in Mexico in her mother's sole care. Three years later, in April 2010, her parents arranged for Elena to be smuggled into the United States and taken to New York, where she began to live in her father's household. During the following months, her mother tried repeatedly and unsuccessfully to cross the border and join Elena and Rivera Castillo in the United States.

Having failed in those attempts, on November 22, 2011, Asuncion Mota filed a petition in the United States District Court for the Eastern District of New York, seeking Elena's return to Mexico under the Hague Convention on the Civil Aspects of International Child Abduction, Oct. 25, 1980, T.I.A.S. No. 11,670, 1343 U.N.T.S. 89, *reprinted in* 51 Fed. Reg. 10,494 (Mar. 26, 1986) (the "Hague Convention" or "Convention"), as implemented by the International Child Abduction Remedies Act, 42 U.S.C. § 11601 *et seq.* ("ICARA"). The district court (Jack B. Weinstein, *Judge*) concluded that Rivera Castillo wrongfully retained Elena in the United States and

2

that the Convention required the court to order that Elena be returned to Mexico for custody proceedings there. *A.A.M. v. J.L.R.C.*, 840 F. Supp. 2d 624 (E.D.N.Y. 2012). Rivera Castillo appeals.

We affirm the district court's findings of fact and its application of the Convention and ICARA to those facts, and we remand this matter with instructions that the district court enter such orders as may be necessary to effect Elena's prompt and safe return to Mexico.

## I.    BACKGROUND

### A.    Factual History

The district court found that the following facts were established by a preponderance of the evidence.

Asuncion Mota and Rivera Castillo married in Puebla, Mexico in March 2006. Later that year, in September, Asuncion Mota gave birth to their daughter, Elena. For the first six months of her life, Elena lived in Puebla with both of her parents. Then, in March 2007, when Elena was six months old, Rivera Castillo left Puebla and entered the United States illegally. He traveled to Queens, New York, where he obtained full-time employment, and began sending financial support to his wife and daughter. Meanwhile, in Mexico, Asuncion Mota assumed sole responsibility for Elena's day-to-day care, and she and Rivera Castillo maintained regular communication via telephone.

In the spring of 2010, Asuncion Mota and Rivera Castillo decided to reunite their family: mother and child would move to New York, where the three would

again live together. Toward that end, mother and father agreed to the following arrangements. Asuncion Mota, her uncle, and Elena would travel from Puebla to Nogales, a Mexican city close to the Arizona border. There, using funds provided by Rivera Castillo, Mota would hire a person or persons to smuggle Elena across the border. After Elena had entered the United States, Asuncion Mota and her uncle would cross the border themselves, and travel with Elena to New York.

The plan was successful only in part. Asuncion Mota was able to arrange for smugglers to take Elena across the border, but the repeated attempts of Asuncion Mota and her uncle to follow Elena into the United States were blocked by American border guards, and the two were returned in each instance to Mexico. Meanwhile, the smugglers had transported Elena on her own to New York, where she began living with her father.

After living for some months more in a house in Nogales, Asuncion Mota procured for herself and her uncle certain false identification, which they used in a renewed attempt to cross the border. This attempt, too, failed, but with more disastrous consequences: the pair were arrested and prosecuted for use of false identification. Each pleaded guilty and served a seventy-five-day prison term in the United States before being deported to Mexico.

By the time Asuncion Mota was deported after her release from prison, it had become "apparent" (as the district court described) that "the plan for the mother to enter the United States and travel to New York had been, and would continue to be, frustrated." *A.A.M.*, 840 F. Supp. 2d at 627. Further attempts by Asuncion Mota to

4

enter the United States would expose her to the risk of progressively longer prison sentences. Rivera Castillo, moreover, had begun living with another woman.[1] It became evident that Rivera Castillo would no longer send financial support to Asuncion Mota. And, in response to Asuncion Mota's repeated demands that Elena be returned to her in Mexico, Rivera Castillo declared that he would keep Elena with him in New York.

### B.    Procedural History

In October 2010, Asuncion Mota contacted the Mexican government to request legal assistance in her effort to secure Elena's return to Mexico. Mexican authorities soon thereafter applied to the United States government for the child's return. The United States Department of State forwarded the application to Rivera Castillo in April 2011, and asked that he consider returning the child to Mexico "voluntarily" to avoid the initiation of proceedings under the Convention. Within two weeks of being contacted by the State Department, Rivera Castillo instituted custody proceedings in New York Family Court, seeking sole custody of Elena. (Those proceedings are now being held in abeyance, pending resolution of this suit.)

Having obtained no relief through official diplomatic channels, in November 2011 Asuncion Mota filed a petition in federal district court seeking an order requiring Rivera Castillo to return Elena to her in Mexico. *See A.A.M.*, 840 F. Supp. 2d 624. Rivera Castillo opposed the petition. The court permitted the parties

---

[1] When the district court held its hearing, in December 2011, Rivera Castillo's new companion had given birth to a son, Elena's half-brother.

limited discovery, and then held a two-day bench trial in which Asuncion Mota, her parents, and her uncle testified via telephone with the aid of interpreters, and Rivera Castillo testified in person. After conducting these proceedings and receiving post-trial briefing from the parties, the court promptly issued a thoughtful decision concluding that Elena's country of "habitual residence" under the Convention was Mexico; that Rivera Castillo had "wrongfully retained" Elena in contravention of Asuncion Mota's custody rights under Mexican law; and that the Hague Convention and ICARA therefore required that Elena be returned to Mexico forthwith. *Id.* at 635, 639. The court then entered judgment and a detailed order designed to effect Elena's return. This appeal followed.

## II. DISCUSSION

### A. Standard of Review

In cases arising under the Hague Convention and ICARA, we review a district court's factual determinations for clear error. *Gitter v. Gitter*, 396 F.3d 124, 129 (2d Cir. 2005). We review *de novo* a district court's interpretation of the Convention and its application of the Convention to the facts. *Id.*

### B. Applicable Law

As we discussed in depth in our 2005 decision in *Gitter*, the Hague Convention was enacted "to protect children internationally from the harmful effects of their wrongful removal or retention and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." *Id.* (quoting Hague Convention, Preamble). The

6

Convention's drafters were particularly concerned by the practice in which a family member would remove a child "to jurisdictions more favorable to [his or her] custody claims in order to obtain a right of custody from the authorities of the country to which the child ha[d] been taken." *Id.* (internal quotation marks omitted). To deprive such disfavored conduct of any "practical or juridical consequences," the Convention "places at the head of its objectives the restoration of the *status quo*, by means of the prompt return of children wrongfully removed to or retained in any Contracting State." *Id.* at 130 (quotation marks omitted); *see also* Hague Convention, art. 1 ("The objects of the . . . Convention are: (a) to secure the prompt return of children wrongfully removed to or retained in any Contracting State; and (b) to ensure that rights of custody and of access under the law of one Contracting State are effectively respected in the other Contracting States.").[2]

The Convention does not establish substantive standards for resolving the merits of any underlying custody dispute. Hague Convention, art. 19. Rather, the Convention's focus is simply upon whether a child should be returned to her country of habitual residence for custody proceedings. *In re B. Del C.S.B.*, 559 F.3d 999, 1002 (9th Cir. 2009). To that end, ICARA provides that "[a]ny person seeking to initiate judicial proceedings under the Convention for the return of a child or for

---

[2] The United States adopted the Hague Convention's provisions and became a "Contracting State" with the ratification effected by the passage of ICARA in 1988. *See* Pub. L. No. 100-300, 102 Stat. 437 (codified as amended at 42 U.S.C. §§ 11601-11611). Mexico became a party to the Convention on October 1, 1991. *See* Hague Conference on Private International Law, http://www.hcch.net/index_en.php?act=states.details&sid=54 (last visited Aug. 6, 2012); *Duarte v. Bardales*, 526 F.3d 563, 568 n.7 (9th Cir. 2008).

7

arrangements for . . . securing the effective exercise of rights of access to a child may do so by commencing a civil action" in a state or federal court "in the place where the child is located at the time the petition is filed." 42 U.S.C. § 11603(b).

The Convention places two substantive provisions at the core of any petition seeking relief. A petitioner must demonstrate: (a) the child in question was "habitually resident" in a Contracting State before the child's removal to or retention in a different state, and (b) removal or retention of the child was "wrongful." *See* 42 U.S.C. § 11603(e)(1)(A); Hague Convention, arts. 1, 3, 4; *Gitter*, 396 F.3d at 130. A preponderance of the evidence must support a petitioner's showing. 42 U.S.C. § 11603(e)(1).

In the absence of any guidance from the Convention or ICARA regarding the crucial determination of a child's state of "habitual residence," our Court in *Gitter* adopted the following approach:

> First, the court should inquire into the shared intent of those entitled to fix the child's residence (usually the parents) at the latest time that their intent was shared. In making this determination the court should look, as always in determining intent, at actions as well as declarations. Normally the shared intent of the parents should control the habitual residence of the child. Second, the court should inquire whether the evidence unequivocally points to the conclusion that the child has acclimatized to the new location and thus has acquired a new habitual residence, notwithstanding any conflict with the parents' latest shared intent.

*Gitter*, 396 F.3d at 134.[3]

---

[3] The district court questioned the applicability of the *Gitter* analysis in the factual setting presented here. In *Gitter*, the parents started in country A, moved together with their son to country B, and the mother then returned with the child to country A. Here, the parents started in country A; one moved to country B, the other remaining behind. We see no reason to depart from the principles

8

As to the "wrongfulness" of the removal or retention, the Convention itself sets forth the applicable rule:

> The removal or the retention of a child is . . . wrongful where –
> a) it is in breach of rights of custody attributed to a person, an institution or any other body, either jointly or alone, under the law of the State in which the child was habitually resident immediately before the removal or retention; and
> b) at the time of removal or retention those rights were actually exercised, either jointly or alone, or would have been so exercised but for the removal or retention.

Hague Convention, art. 3.

If the court determines that a petitioner has satisfied this burden as to the two core elements—habitual residence and wrongful retention—the court must ordinarily "order the return of the child forthwith." Hague Convention, art. 12; *see also* 42 U.S.C. § 11603(d). A court is not bound to order the child's return if the respondent can successfully establish that any of four statutory exceptions applies, *see* Hague Convention, art. 12, 13, 20 (enumerating exceptions); *see also* 42 U.S.C. § 11603(e)(2), but the exceptions are to be narrowly read, *Blondin v. Dubois*, 189 F.3d 240, 246 (2d Cir. 1999) (citing 42 U.S.C. § 11601(a)(4)).

C.   Analysis

For the reasons set forth below, we conclude that Mexico was the country of Elena's habitual residence at the time relevant for this analysis; that Rivera Castillo has wrongfully retained Elena in the United States; and that no statutory

___

articulated in *Gitter,* which, as we apply them, lead us to the same legal conclusion as the district court reached, albeit by a modestly different path. Although the parties' intent presents a factual determination that we review for clear error, the determination of "habitual residence" under the Convention is "a legal precept that we review *de novo.*" *Gitter,* 396 F.3d at 133 & n.8.

9

exception applies. Elena must therefore be returned to Mexico, where her parents' respective custody rights may be fully adjudicated.

### 1. *Habitual Residence*

We first consider whether Asuncion Mota proved by a preponderance of the evidence that Elena was removed to or retained in a state other than the state of her habitual residence. *See Gitter*, 396 F.3d at 130–31. Although the circumstances of her initial removal are subject to dispute (as we will discuss), it is clear that Rivera Castillo has retained Elena within the United States. Therefore, if Asuncion Mota has proved that Elena was a habitual resident of Mexico at the time of the retention, Asuncion Mota has satisfied the first prong of *Gitter*, and we proceed to the second prong, where we ask whether that retention is "wrongful." *Id.* If Asuncion Mota has not carried this burden, however, her petition fails at the threshold: the child must have been removed to or retained in a Contracting State other than her State of habitual residence for the Convention to apply. *Id.* at 130.

### a. Shared intentions of the parents

As previously noted, our primary consideration in determining a child's place of habitual residence is the shared intention of the child's parents "at the latest time that their intent was shared." *Id.* at 134. "[T]his is a question of fact in which the findings of the district court are entitled to deference, and we consequently review those findings for clear error." *Id.* at 133. Under the deferential "clear error" standard, "[w]e will not upset a factual finding unless we are left with the definite and firm conviction that a mistake has been committed." *Bessemer Trust*

10

*Co. v. Branin*, 618 F.3d 76, 85 (2d Cir. 2010) (quoting *White v. White Rose Food*, 237 F.3d 174, 178 (2d Cir. 2001)).  We have no such "definite and firm" conviction here.

For the first three and one-half years of her life, Elena's habitual residence was in Mexico: until she was brought to the United States in 2010, Elena had lived only in Mexico, apparently with the intention of both parents that their daughter would live in Mexico indefinitely.  No argument has been made to the contrary.

According to Rivera Castillo, however, as of April 2010 "it was the parties' settled intention" that Elena "move . . . to the United States."  Appellant Br. at 12.  This new intention, he argues, "negates the conclusion that Mexico continued to be her habitual residence."  *Id.*  Rivera Castillo calls "clear error" the district court's finding that the parents' agreement that Elena would move to New York was conditioned upon Elena joining a household that included both her father *and* her mother.  *See A.A.M.*, 840 F. Supp. 2d at 637.  In support, Rivera Castillo emphasizes that only he testified as to the specifics of the agreement to move the family to the United States, and that his testimony did not suggest that Elena's habitual residence in America was contingent upon Asuncion Mota's success in entering the country.  Thus, when asked on cross-examination whether Asuncion Mota had consented to Rivera Castillo keeping Elena in the United States, even if Asuncion Mota did not join them, Rivera Castillo answered, "We never talked about there being any kind of condition."  Trial Tr. 105.  In response to the district court's query whether Rivera Castillo had "ever discuss[ed] with [Asuncion Mota] what would happen if the child came over and she did not," Rivera Castillo answered, "We never talked about that."  *Id.* at 107.

11

Rivera Castillo also posits that Asuncion Mota offered "no evidence that her consent to Elena's move to the United States was conditioned on her own ability to achieve entry into the United States." Reply Br. at 10 (internal quotation marks omitted). He points out that the district court rejected as incredible Asuncion Mota's account of the planned border crossing, and argues that there was no basis on which the district court could reasonably find that a condition attached to the plan for Elena to be brought to New York.

We are not persuaded. Notwithstanding Rivera Castillo's assertions and the district court's rejection of the particulars of Asuncion Mota's account of Elena's border crossing, the record evidence sustains the district court's factual finding as to the parties' latest shared intention. *See Krizek v. Cigna Grp. Ins.*, 345 F.3d 91, 100 (2d Cir. 2003) ("[C]lear error review . . . does not entitle us to second guess a district court's . . . inferences" provided the inference drawn has "some evidentiary basis in the record").

Asuncion Mota was Elena's primary caretaker for the first three and one-half years of her daughter's life, and, as the district court found, Elena "was raised in a loving, supportive home in Mexico." *A.A.M.*, 840 F. Supp. 2d at 638. Asuncion Mota proved herself a devoted mother and was persistent in her efforts to retrieve Elena after the plan fell through. After her multiple failed attempts to enter the United States, and having served a seventy-five-day term of incarceration, Asuncion Mota demanded that Rivera Castillo return Elena to Mexico. She contacted Mexican authorities to obtain help in recovering her child. She instituted this

12

lawsuit, and has continued to prosecute it from Mexico in hopes of reuniting with Elena. During the bench trial, Elena was put on the phone so that she could listen to and speak with her mother. As the district court observed, Elena "was obviously delighted to hear her mother's voice," and "[i]t was clear that a warm relationship continued to exist between the two." *Id.* at 628.

The impression of Asuncion Mota that emerges from the record is that of a committed parent who has sought to keep her child close to her. The record is devoid of any suggestion that Asuncion Mota intended permanently to abandon Elena. And, in fact, Asuncion Mota testified that she *never* intended that Elena would live permanently in the United States, and that she had only helped smuggle Elena across the Arizona border to allow her father to visit with her for a few hours. Although the district court rejected the particulars of this account as not credible, it permissibly relied on the core of Asuncion Mota's testimony, to the effect that she always intended for Elena to be by her side. The district court thus reasonably inferred from Asuncion Mota's actions, the proffered testimony, and personal observations that it was more likely than not that Asuncion Mota intended for Elena to live in the United States *only if* she herself could join the household and continue to raise her child. On review, we are not "left with the definite and firm conviction" that the district court was mistaken. *Bessemer Trust Co.*, 618 F.3d at 85. We therefore decline to disturb its finding.

Asuncion Mota's intention that Elena live in the United States only if she, as mother, were able to join Elena there is dispositive of our determination of Elena's

13

habitual residence. If Rivera Castillo shared this conditional intention with his wife, Elena's habitual residence would lie in Mexico, because the condition was not satisfied. Were Asuncion Mota unable to join her daughter in America, Elena's stay would be temporary, and the daughter would rejoin her mother in Mexico, her habitual residence. And if (as he says) Rivera Castillo did not share his wife's understanding, Elena's habitual residence would still lie in Mexico: if the parents did not agree that Elena would live indefinitely in America regardless of her mother's presence, it cannot be said the parents "shared an intent" in April 2010 that America would be Elena's state of habitual residence. Thus, the "latest time" (in *Gitter*'s phrase) in which Asuncion Mota and Rivera Castillo shared an intent regarding Elena's habitual residence would have occurred earlier—before they decided to have Elena and her mother join Rivera Castillo in New York, and when both parents intended that Elena would live indefinitely in Mexico. *See Gitter*, 396 F.3d at 134.

> b.     The child's acclimatization to her new surroundings

Although the shared intentions of Elena's parents strongly favor a conclusion that Mexico is Elena's state of habitual residence for Convention and ICARA purposes, *Gitter* advises that we must also consider whether "evidence points unequivocally to the conclusion that [Elena] has become acclimatized to [her] new surroundings and that [her] habitual residence has consequently shifted" to the United States. *Id.* at 133. In analyzing this factor, we are mindful that courts should be "slow to infer" that a child's acclimatization "trumps the parents' shared

14

intent." *Id.* at 134. It would frustrate the objectives of the Convention if a parent or guardian could secure an advantage in an anticipated custody dispute merely by whisking the child away to a foreign land, and retaining her there long enough to amass evidence of the child's acclimatization to the new location. *See id.* Therefore, only in "relatively rare circumstances" in which a child's degree of acclimatization is "so complete that serious harm . . . can be expected to result from compelling his [or her] return to the family's intended residence" might we conclude that the child's habitual residence has shifted to his or her new location. *Id.; see also Mozes v. Mozes*, 239 F.3d 1067, 1081 (9th Cir. 2001) ("The question . . . is not simply whether the child's life in the new country shows some minimal degree of settled purpose, but whether we can say with confidence that the child's relative attachments to the two countries have changed to the point where requiring return to the original forum would now be tantamount to taking the child out of the family and social environment in which its life has developed." (internal quotation marks and citation omitted)).

The evidence in this case in no way suggests that returning Elena to Mexico would subject her to serious harm. Elena spent the first three and one-half years of her life in a "loving, supportive home in Mexico," *A.A.M.*, 840 F. Supp. 2d at 638, and a "warm relationship continue[s] to exist between" her and her mother, *id.* at 628. Indeed, the district court expressly found that Elena "faces no risk of harm, physical or psychological, upon her return" to Mexico. *Id.* at 638.

15

We recognize that Elena has lived for the past two years in New York. But this duration of time is not nearly so great that we could presume that returning her to Mexico would expose her to the "severe harm" one associates with a child's "deprivation of [her] acclimatized life." *Cf. Gitter*, 396 F.3d at 134 (observing that "a child who has spent fifteen years abroad . . . would predictably suffer severe harm if returned to the state he had experienced only at birth," and that this harm "might overcome" the parents' last shared intent). This is particularly so given the evidence of the loving home with her mother that awaits Elena in her native country. We are compelled to note, also, that her uncertain immigration status, as well as the admittedly undocumented status of her father, places an additional obstacle on the path to determining that a supervening acclimatization has occurred.

For the foregoing reasons, we conclude that the evidence adduced before the district court is sufficient to support the district court's finding that when last they shared an intent about Elena's residence, Elena's parents intended that she live in Mexico—a factor we assign controlling weight in fixing the state of the child's habitual residence. The evidence in this case does not point unequivocally to the conclusion that Elena has become acclimatized to her new surroundings and that her habitual residence has shifted to the United States as a consequence. Because Elena was a habitual resident of Mexico at the time Rivera Castillo retained Elena in the United States, the first prong of *Gitter* is satisfied.

16

### 2. *Wrongful Retention*

Having found that Mexico was the country of Elena's "habitual residence," we next ask whether as a matter of law Rivera Castillo's removal or retention of Elena "was in breach of [Asuncion Mota's] custody rights under the law of the State of habitual residence," and whether the evidence shows that Asuncion Mota was exercising those rights at the time of the retention—or would have been exercising those rights but for the retention. *Gitter*, 396 F.3d at 130–31. We hold that both law and evidence favor Asuncion Mota.

Mexico's law of custody, known as *patria potestas*, "places a series of correlative rights and obligations on the holder of parental authority." Patricia Begne, *Parental Authority and Child Custody in Mexico*, 39 Fam. L.Q. 527, 531 (2005) (quoting Amparo Directo 2078/1974, Victor Manual Martinez Fernandez (1975)). These rights and obligations include "custody of the minors, the authority to raise them, discipline them, represent them in legal acts, administer their property, feed and care for them," as well as the right to chose the minor's place of domicile. *Id.* at 531, 534. Rivera Castillo does not—and cannot—dispute that his retention of Elena in the United States violates Asuncion Mota's right under Mexican law to maintain physical custody of her daughter.

In addition, the evidence supports the district court's uncontested factual finding that Asuncion Mota would be exercising this custody right "but for the retention by [Rivera Castillo] in New York." *A.A.M.*, 840 F. Supp. 2d at 637 (internal quotation marks and ellipsis omitted). Asuncion Mota raised Elena for the

17

first three and one-half years of her life. She seeks Elena's return to Mexico so she can continue to care for her daughter, and meet her parental obligations. The record is consistent only with the conclusion that Asuncion Mota would be exercising her parental authority now were it not for Elena's retention by Rivera Castillo, and we have heard no argument to the contrary.

Because Rivera Castillo's retention of Elena in the United States violates Asuncion Mota's custody rights under Mexican law, and because Asuncion Mota would have exercised these rights but for that retention, we conclude that the retention is wrongful under the Convention.

### 3. Inapplicability of any exception

The petitioner having carried her burden, we now consider whether Rivera Castillo has established that an exception to the Convention applies. Rivera Castillo argues that the "consent" exception set out in Article 13 of the Convention applies in this case. Under this exception, a district court is not bound to return a wrongfully removed or retained child if the respondent demonstrates by a preponderance of the evidence that the petitioner "had consented to or subsequently acquiesced in the removal or retention." Hague Convention, art. 13(a); *see also* 42 U.S.C. § 11603(e)(2)(B).

We agree with the district court that Rivera Castillo's argument is unavailing. As previously discussed in the context of our review of the parties' latest "shared intent," Asuncion Mota's consent to her daughter's relocation was conditioned upon her own ability to join father and daughter in New York. The

18

failure of this condition annulled Asuncion Mota's consent. *Cf. Baxter v. Baxter*, 423 F.3d 363, 371 (3d Cir. 2005) (holding that "[t]he nature and scope of the petitioner's consent, and any conditions or limitations, should be taken into account" in examining a consent defense under Article 13 of the Convention).

Rivera Castillo also urges us to consider whether the exception set forth in Article 12 of the Convention might apply here. Under Article 12, a court is not bound to return a wrongfully removed or retained child if the respondent shows by a preponderance of the evidence (1) that the return proceeding was commenced more than one year after the wrongful removal or retention, and (2) that the child "is now settled in its new environment." Hague Convention, art. 12; *see also* 42 U.S.C. § 11603(e)(2)(B). But Rivera Castillo did not raise this issue before the district court, and makes only passing reference to it in his reply brief on appeal. We therefore treat this argument as waived. *See In re Nortel Networks Corp. Sec. Litig.*, 539 F.3d 129, 133 (2d Cir. 2008) ("Although we may exercise discretion to consider waived arguments where necessary to avoid a manifest injustice, the circumstances normally do not militate in favor of an exercise of discretion to address new arguments on appeal where those arguments were available to the parties below and they proffer no reason for their failure to raise [them]." (internal quotation marks and alterations omitted)); *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) (noting that "stating an issue without advancing an argument, or raising an issue for the first time in a reply brief" do not suffice to preserve an issue for appeal).

19

Moreover, declining to consider this new issue does not result in a "manifest injustice," *see Nortel Networks*, 539 F.3d at 133, particularly in light of the urgent need for definitive custody proceedings to begin and this suit to be resolved. Rivera Castillo has not developed an adequate record on which to decide whether Elena is "settled" in her new environment—a standard different from that of acclimatization, developed in *Gitter*. Hewing to the salutary principle that exceptions to the Convention must be interpreted narrowly, *see* 42 U.S.C. § 11601(a)(4); *Blondin*, 189 F.3d at 246, we are doubtful that the exception would apply even were we to reach this issue.

## III.  CONCLUSION

Asuncion Mota has demonstrated by a preponderance of the evidence that her daughter Elena is wrongfully retained in the United States, outside of the country of her habitual residence. Pursuant to the Hague Convention and ICARA, the district court correctly ruled that Elena must be returned to Mexico for custody proceedings. We therefore **AFFIRM** the judgment of the district court, and **REMAND** the matter to the district court with instructions to the court to enter such orders as are necessary to facilitate Elena's return to her mother's custody in Mexico.[4]

---

[4] In this regard, counsel for Asuncion Mota, appearing at oral argument before this Court, supplied the following definitive address for use by the district court and Rivera Castillo: Articulo 123, No 1502, Colonia Hogar del Obrero, Atlixco Puebla, Mexico.